## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

ERIC POWERS,
      **Plaintiff,**                  **Civil Action No. 7:19cv00714**

v.                             **REPORT AND RECOMMENDATION**

CARL MANIS, et al.,            **By:  Pamela Meade Sargent**
      **Defendants.**           **U. S. MAGISTRATE JUDGE**

      This pro se prisoner's civil rights action is before the court on three separate motions for temporary and/or preliminary injunctive relief, (Docket Item Nos. 27, 42, 48) ("Motions").  The Motions are before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). The undersigned now submits the following report and recommended disposition.

### *I.   Facts*

      The pro se plaintiff, Eric Powers, ("Powers"), has filed this action pursuant to 42 U.S.C. § 1983 against various Virginia Department of Corrections, ("VDOC"), employees of Wallens Ridge State Prison, ("Wallens Ridge"). In his Amended Complaint, (Docket Item No. 20) ("Complaint"), Powers alleged that his Eighth Amendment right to be free from cruel and unusual punishment was violated beginning in January 2018 and continuing by the denial of recreation, showers, phone and kiosk use, meals and classes designed to assist in recovery from mental illness, constant illumination of his cell, destruction of personal property, threats of physical harm, harassment and name-calling by staff and constant noise caused by other prisoners kicking, banging, screaming and taunting each other. In his

Complaint, Powers seeks an order transferring him to Marion Correctional Treatment Center, ("MCTC"). On January 23, 2020, Powers filed an affidavit, requesting the court to grant his "motion for preliminary injunction and temporary restraining order." (Docket Item No. 27.) On April 6, 2020, Powers wrote the court, again, asking that the court enter an order requiring the defendants to provide him with the "privileges and incentives he's earned within the High Security Diversionary Treatment Program; to stop denying [him] graduation from the High Security Diversionary Treatment Program; to stop harassing [him] with unnecessary disciplinary charges that hinder [his] progression through the program; and to stop threatening [his] physical safety." (Docket Item No. 42-2.) On April 29, 2020, Powers wrote the court, stating that he had been approved for transfer to River North Correctional Center, ("River North"), but, due to the COVID-19 pandemic, the VDOC has halted all prison transfers for any purpose other than emergency medical treatment. (Docket Item No. 48). Powers sought an order requiring the VDOC to transfer him to River North.

In his Complaint, which is signed under penalty of perjury, Powers stated that the serious mental illness pod at Wallens Ridge has been understaffed since July 2018 and continuing. Powers stated that the pod had only two treatment officers, who were available from 5:30 a.m. to 2 p.m. Monday through Friday, except for holidays. Powers stated that Treatment Officers Sluss, Clarke and Parsons had denied him and other prisoners recreation, showers, use of phone and kiosk and classes designed to assist in mental illness recovery because they were upset or did not feel like "pulling" the prisoners. Powers's Complaint does not identify any specific dates on which he or other prisoners were denied any of these activities. Powers also stated that Sluss, Clarke and Parsons had "instigated" him and other

2

prisoners, threatened them and destroyed prisoners' property out of anger. Again, Powers's Complaint does not identify any specific incidents in support of this allegation.

Powers also stated that he had complained to Unit Manager J. Ely about the constant illumination of his cell, impacting his sleep patterns and causing him to be fatigued and unable to think clearly. Powers stated that Ely, on an unspecified date, had Treatment Officers Craft and Parsons escort him to Ely's office, where Ely threatened to "beat the shit out of" Powers. Powers said that, when he complained to Ely, Ely would call him a "cry baby" and tell him to "shut up and deal with it." Powers said that, when he complained about other prisoners in his pod constantly kicking, banging, screaming and taunting each other and requested to be provided with ear plugs, Assistant Warden Anderson and "mental health professionals" denied his request. He said that Ely told him he was just a "cry baby" and "just deal with it." Again, Powers has provided no specific dates on which any of these incidents occurred.

Powers said the way he has dealt with the harassment and conditions was by unspecified suicide attempts by cutting him neck and arms. Powers said that he had complained to Chief of Housing and Programs, Dennis Collins, Ely, Warden Carl Manis and mental health professional Shaya Hawkins about segregation officers coming through the pod harassing and threatening Powers, denying Powers meals, recreation, showers and phone use. Powers said Collins, Ely, Manis and Hawkins responded for him to "deal with it" and called him a "whiny-ass cry-baby." He said this "resulted in other suicide attempts by cutting my neck and arms and chest open." Again, Powers has provided no dates on which this occurred.

3

Powers said he had reported to Ely, Collins and Manis that emergency intercom buttons had been turned off by officers in the control booth. Powers said that prisoners had been told that intercom buttons were not working for two years and that a work order had been filed, but no repairs had been made. Powers said, if intercom buttons worked, "suicide attempts and self-mutilations due from mental breakdowns could have been prevented." Again, Powers did not say when these suicide attempts or self-mutilations had occurred.  Powers said, when he had complained that the abuse, mistreatment and extreme conditions of confinement had caused him to feel suicidal, Ely, Manis and Collins called him a "cry baby" and told him to "deal with it" instead of taking any action. Powers said that he had completed all classes offered, but one. He said that he had requested a transfer to a less stressful pod or to MCTC.

Powers attached numerous disciplinary offense and administrative remedies forms to his Complaint, without any explanation of how they relate to his claims. (Docket Item No. 20-1.) These documents include a Disciplinary Offense Report, dated July 28, 2018, showing that Powers was charged with violating Offense Code 139 for self-mutilation or other intentionally inflicted self-injury. (Docket Item No. 20-1 at 1.) According to the Description Of The Offense section, Officer R. Catron had discovered that Powers had "been head butting the door causing a pump knot that had started to bleed." Catron said that he reported this incident to Sgt. McCray. Powers provided another Disciplinary Offense Report, dated September 3, 2018, on which he also was charged with violating Offense Code 139 for self-mutilation or other intentionally inflicted self-injury. (Docket Item No. 20-1 at 2.) This Report stated that Officer M.R. Sluss, while conducting a security check, observed that

4

Powers had cut himself. Powers provided a third Disciplinary Offense Report, dated July 11, 2019, showing that he was charged with violating Offense Code 139 for self-mutilation or other intentionally inflicted self-injury. (Docket Item No. 20-1 at 3.) According to this Report, Sluss said that Powers told him "We're going to medical now bitch" and began cutting himself with an unidentified object.

Powers also has provided an April 24, 2019, Grievance Receipt, showing that the he complained of the High Security Diversionary Treatment Program, ("HSDTP"),[1] pod being "constantly understaffed" resulting in denial of recreation and classes. Powers also complained that the pod was loud and disruptive, he was subject to "prolonged electronic restrictions," which resulted in excessive sensory deprivation exacerbating his serious mental illness. (Docket Item No. 20-1 at 4.) Powers provided a January 11, 2019, Grievance Receipt, showing that he had complained that he had notified Sgt. Roberts and Lt. Boyd that he had been injured in an assault by Officer Fultz, and neither had notified Medical or allowed a decontamination shower. (Docket Item No. 20-1 at 5.) He said that Capt. Carico arranged for him to be treated by Medical and decontaminated 14 hours later.

Powers provided Regular Grievance WRSP-19-REG-00205, dated May 13, 2019, on which he complained that that the SDTP was "constantly understaffed[,]" resulting in denial of recreation and classes. (Docket Item No. 20-1 at 7.) Powers complained that he was being forced to "earn" very limited contact with his family

---

[1] Powers refers to both the High Security Diversionary Treatment Program, ("HSDTP"), and the Secure Diversionary Treatment Program, ("SDTP"), throughout his pleadings. The defendants also refer to Powers's housing unit at Wallens Ridge as being the HSDTP and/or the SDTP unit. It appears to the undersigned that the two are the same program at Wallens Ridge.

and loved ones, being placed on excessive electronics restrictions for minor charges and having to restart the program over minor charges. Powers said his serious mental illness had deteriorated since joining the program more than a year earlier. Powers said he wanted the "oppressive and harmful conditions" to be dealt with or to be transferred to another facility that could accommodate his mental health needs. This Regular Grievance was deemed unfounded on Level I review. In the Warden's June 10, 2019, response, he stated that Powers had been offered numerous programs, but Powers had refused to come out of his cell to participate. (Docket Item No. 20-1 at 6.) Powers appealed the Warden's decision to Level II, but the decision on appeal has not been provided.

Powers also provided an October 12, 2018, Regular Grievance, complaining that Officer Chandler had called him "retarded" and a "cockroach" and told him to harm himself after Powers asked Chandler to open the lid on a box to allow Powers to retrieve his clean laundry. (Docket Item No. 20-1 at 10.) This Regular Grievance was rejected at intake for an expired filing period. (Docket Item No. 20-1 at 11.) Officer Chandler is not a defendant in this case.

Powers filed a December "10," 2018, Informal Complaint, on which he complained of the "oppressive nature of several [segregation] guards and the adverse psychological & emotional effects it play[ed]" on him. (Docket Item No. 20-1 at 13.) Powers complained of daily panic attacks. He said that, when he tried to get mental health help, unnamed officers ignored him or told him to kill himself or just shut up and lie down. Powers said that this was deliberate indifference to his serious mental illness needs. Powers provided an Offender Request form, on which he inquired about making foam ear plugs available for purchase from the commissary. (Docket

6

Item No. 20-1 at 14.) The responding official stated that "ear plugs are not appropriate for a level five facility."

Powers also provided a December 26, 2018, Informal Complaint, on which he complained that he spent two weeks in segregation and, upon his release, was forced to start the SDTP again from the beginning and with fewer privileges. (Docket Item No. 20-1 at 15.) Powers provided a November 13, 2018, Informal Complaint, on which he complained that he had volunteered for SDTP in January 2018 to help with his bipolar depression and symptoms of post-traumatic stress. (Docket Item No. 20-1 at 16.) Powers stated that "I've been unwillingly forced to live in a hostile environment. I've also completed classes and since I'm unable to adapt to a hostile environment I'm being denied progression through the program." Powers provided a December 24, 2018, Informal Complaint, on which he complained that he had reported Officer Chandler coming around and harassing and threatening prisoners. (Docket Item No. 20-1 at 17.) He said that Chandler had threatened his life and well-being several times in front of other prisoners and told him to kill himself. Powers provided a December 26, 2018, Informal Complaint, on which he complained that Officers Blackwell and Chandler had discarded some of his property. (Docket Item No. 20-1 at 18.) Officer Blackwell is not a defendant in this case.

Powers provided a December 24, 2018, Informal Complaint, on which he claimed it was "deliberate indifference" to allow segregation officers to harass, "instigat[e]" and threaten seriously mentally ill prisoners. (Docket Item No. 20-1 at 19.) Powers also provided a June 4, 2019, Informal Complaint, on which he complained that Officer Bailey turned the intercom emergency buttons off every time someone pushed it. (Docket Item No. 20-1 at 20.) He also complained that two

unnamed floor officers had threatened and harassed prisoners and that they allowed another prisoner to keep the volume loud on his television.  Officer Bailey is not a defendant in this case. Powers provided a September 9, 2018, Informal Complaint, on which he complained of Officer Chandler calling him a "retard" and a "cockroach" after asking him to open his cell door slider to retrieve his laundry. (Docket Item No. 20-1 at 21.) Powers said that Chandler also told him to hang himself.  He said that he had reported Chandler's statements to Lt. Hall, Qualified Mental Health Professional, ("QMHP"), Hawkins, Officer Harris and Officer Coleman. Lt. Hall and Officers Harris and Coleman are not defendants in this case.

Powers provided an August 20, 2018, Informal Complaint, on which he complained that Officer Fusion had clicked the emergency speaker on and immediately off without speaking when Powers had pushed his cell intercom emergency button five times that morning. (Docket Item No. 20-1 at 22.) Officer Fusion is not a defendant in this case. Powers provided a July 9, 2018, Informal Complaint, complaining that several prisoners had reported officer misconduct on numerous occasions by segregation floor officers. (Docket Item No. 20-1 at 23.) He said that certain unidentified officers would "come through, stir things up, then leave out, which causes escalating issues in here." Powers provided two December 1, 2018, Informal Complaints, on which he complained that another inmate in class started yelling, cursing, threatening and making racial slurs toward the white men. (Docket Item No. 20-1 at 24, 25.) He said that he had requested to be removed from the class due to this disturbance, but was refused. Powers provided an August 19, 2019, Informal Complaint, on which he complained that another inmate screamed, kicked his cell door and banged on the wall all day. (Docket Item No. 20-1 at 26.) He said that Officers Cox, Sumpter and Bryson told the prisoner to stop, but he just

8

threatened them and continued. Powers said this prisoner was not charged and kept his prison job. Officers Cox, Sumpter and Bryson are not defendants in this case.

Powers provided a September 8, 2019, Emergency Grievance, on which he complained that he found a hair in his potatoes at supper. (Docket Item No. 20-1 at 27.) He said that when Officer Brown tried to remedy the situation, the kitchen sent a cup of processed meat, but he receives a no-meat Common Fare diet. Powers provided an August 19, 2019, Emergency Grievance, on which he complained that another prisoner was receiving privileges after threatening an officer the previous day. (Docket Item No. 20-1 at 28.)

Powers provided a Regular Grievance, dated November 8, 2019, on which he complained that he wanted to be able to purchase ear plugs or have them issued by the QMHPs. (Docket Item No. 20-1 at 29.) This Regular Grievance was rejected at intake because ear plugs are not an approved item. (Docket Item No. 20-1 at 30.) Powers also provided an October 16, 2019, Informal Complaint, on which he complained about not being provided ear plugs to block out noise. (Docket Item No. 20-1 at 31.)

Powers also provided Regular Grievance WRSP-19-REG-00446, on which he complained of his September 8, 2019, dinner tray being contaminated with a hair. (Docket Item No. 20-1 at 33.) Powers said, when he complained, he received meat and cabbage as a replacement, but he refused it because he receives a no-meat Common Fare diet. Powers said that he wanted the no-meat meal he had been denied. On Level I review, Warden Manis stated that Powers had been offered a replacement tray with a soy protein Kosher-approved product, which Powers refused; Manis

9

deemed the Grievance unfounded. (Docket Item No. 20-1 at 32.) Powers also provided two Informal Complaints, complaining of this same incident. (Docket Item No. 20-1 at 35-36.)

Powers provided a November 26, 2019, Regular Grievance, on which he complained that he had been mistreated by unnamed Wallens Ridge staff in the SDTP for 20 months. (Docket Item No. 20-1 at 37.) He said that Officer Fultz was fired on January 5, 2019, for cutting Powers's arm deliberately and then "gassing" Powers and lying about it. Powers requested release from the SDTP program and placement in a "SAM" pod or to be transferred. This Regular Grievance was rejected at intake as being different from the complaint contained in the Informal Complaint. (Docket Item No. 20-1 at 38.) The Informal Complaint contained a complaint about segregation staff refusing to correct meal trays and cussing and threatening inmates. (Docket Item No. 20-1 at 39.) Fultz is not a defendant in this case.

Powers also provided an October 27, 2019, Regular Grievance WRSP-19-REG-00485, on which he complained that he was provided showers only on Monday the "week we came off lockdown;" he also complained about receiving only 30 minutes of recreation on Tuesday that week. (Docket Item No. 20-1 at 40.) Powers also provided an October 1, 2019, Informal Complaint, on which he complained that Ely had allowed officers to refuse recreation and showers to serious mental illness prisoners after the prisoner had come off lockdown on September 29, 2019. (Docket Item No. 20-1 at 42.)

On January 23, 2020, Powers filed an affidavit, (Docket Item No. 27) ("Powers Affidavit"), in which he stated that he attempted to kill himself on

10

November 10, 2019, by slicing his neck several times with a razor blade due to mistreatment and threats by unnamed officers toward him. Powers said that he was transferred back to segregation housing in the D Building from medical precautions on November 18, 2019, when officers served him a meal tray with "miniscule portions of food on it." He said the unnamed officers taunted him and told him to kill himself. Powers said that he proceeded to slice his neck and arms open with a razor blade, trying to kill himself again.

Powers said that, on December 23, 2019, he was released from medical observation back to the D-3 Pod where he had been mistreated, abused and violently assaulted since April 2018 with no relief. Powers did not identify any specific staff member he accused of this abuse. Powers said that he had tried to ask for help several times for suicidal tendencies based on mistreatment by unnamed segregation staff and Unit Manager Ely threatening him and telling the officers to serve him underportioned trays or trays with meat on them instead of the vegetarian Common Fare he was supposed to receive. Powers said that Ely told officers to deny him and other serious mental health prisoner showers and outside recreation on the weekends and holidays, while allowing the prisoners housed in other pods in the same building to participate in showers and recreation. Powers stated, "If the court does not grant my motion for preliminary injunction and temporary restraining order I may suffer immediate and irreparable damage by way of suicide."

A proposed order filed with Powers's Affidavit sought preliminary injunctive relief, prohibiting defendants Warden Carl Manis, Assistant Warden Anderson, Collins, Saylor, Ely, Sluss and Clark from any contact with him and ordering these

defendants and Lovell not to house him at Wallens Ridge. Anderson no longer is a defendant in this case.

On February 7, 2020, Powers filed a letter with the court in support of his request for preliminary injunctive relief. (Docket Item No. 31.) In this letter, which is neither sworn nor offered under penalty of perjury, Powers stated that Ely and Lovell had treatment officers escort him to the pod office on January 30, 2020,[2] and chained him to a table while they harassed him, laughed at him and told him he would never get anywhere with his civil rights lawsuit against them. He said that Ely told him that he did not have to do what a judge told him to do because it was his building, and he would treat Powers as he wanted. He said that Ely told him the United States Constitution did not dictate what Ely did to Powers.

Powers also stated that Ely stopped him on February 4, 2020,[3] while being escorted to the recreation cage and told him, if Powers asked him about the treatment staff picking up his mail again, he would have Powers placed in ambulatory restraints with his wrists chained to his ankles for a couple of days so Powers could think about his actions, and he would make sure his staff did not pick up Powers's mail for a month to teach Powers a lesson. Powers said that Ely told him that, if Powers kept writing complaints about Ely understaffing the pod, or if Powers's family kept calling the prison to complain, he would place a charge against Powers

---

[2] This letter actually alleges this occurred on January 30, 2019, but the court interprets this as a typographical error.

[3] Again, the letter states this occurred on February 4, 2019.

so Powers would be placed on phone restrictions and could not talk to his loved ones. Powers asked for the court's assistance because he was in "a state of despair."

The defendants have provided affidavits from S. Stallard, R. Saylor and J. Ely, (Docket Item Nos. 32-1, 32-3, 34), in response to Powers's request for temporary injunctive relief.   S. Stallard, the Director of Wallens Ridge Food Service Operations, stated she was aware that Powers had alleged that he was supposed to receive a vegetarian Common Fare diet, but had been served underportioned trays or trays with meat. Stallard said that Powers had been on the Common Fare diet at Wallens Ridge since April 2018.

She said that the Common Fare diet was an appropriate diet for offenders whose religious dietary needs could not be met by the Master Menu. She said that the Common Fare diet was served at selected VDOC facilities in accordance with policies and directives issued by her office, as authorized by the VDOC Chief of Corrections Operations. Stallard said that all Food Service staff in designated Common Fare institutions were trained in Common Fare. She said that Common Fare foods were stored in designated areas, prepared and cooked away from the non-Common Fare foods in separate areas. Stallard said that foods offered on the Common Fare diet, other than fresh fruits and vegetables, were certified by a recognized Orthodox standard.  She said that all pans, lids, utensils and other equipment were cleaned and handled in accordance with strict guidelines apart from the non-Common Fare items.  She said that food workers could not handle both Common Fare and non-Common Fare items at the same time.  Stallard said that all Common Fare meals were placed on clean and purified serving lines and put into

designated serving trays, which were covered and placed in either a hot unit or refrigerated unit to keep the temperature constant.

Stallard said that Wallens Ridge Food Service staff prepared offender meals based on the Master Menu issued by the VDOC Dietician, including the regular menu, non-meat and Common Fare options. Common Fare is a non-meat meal, she said. The only meat on Common Fare is fish -- either tuna or mackerel. Stallard said that, if an offender chose not to eat fish, the alternative was beans. Stallard said that she received a request from Powers to be listed for a Common Fare alternative meal. She said that Powers's meal preference was changed to Common Fare alternative, effective February 27, 2019.

Stallard said that, although she did not look at every tray prepared, she conducted many spot checks on meals each day. She said that other Food Services personnel provided random checks of trays for quality and quantity at every meal. To ensure proper food portions, Stallard said, Food Services personnel provided serving utensils to the line servers; the utensil portion sizes matched the portion sizes on the menu for each meal. Stallard said that the Regional Field Director also visited Wallens Ridge on a quarterly basis to observe the portioning and serving of meals, and the VDOC Dietician visited Wallens Ridge yearly for an annual review. During these inspections, Stallard said, quality control reports were completed, indicating that the food is prepared, and the portions are accurately served, in accordance with the menus.

Stallard said, on February 17, 2019, an informal complaint was received from Powers, on which he complained that the food portions on his tray were small. Food

14

Service Supervisor Dinsmore responded to Powers that all trays had the correct portions as planned by the state dietician, and the trays were randomly checked for proper portion size. Stallard said that Common Fare diet is not served cafeteria-style to offenders in the D-3 Pod where Powers was housed, but, rather, the Common Fare diet trays were prepared, inspected, covered and maintained at a specified temperature. The trays then were placed on a heated food cart and delivered to the offender housing units by staff, and the carts were plugged into an outlet to maintain the required temperature until the meals were served. Stallard said, each day, a copy of the bed log for the D-3 Pod was sent to the housing unit with the meal carts; this log reflected that Powers received the Common Fare alternative tray.

Stallard said that, to the best of her knowledge, Powers's dietary needs were adequately being met on the Common Fare diet, and he was not being served trays with flesh or meat.

The defendants also have provided an affidavit from R. Saylor, a Psychology Associate Senior at Wallens Ridge. (Docket Item No. 34.) Saylor stated that he was aware that Powers had alleged that, while housed in the D-3 Pod at Wallens Ridge, he had tried to ask for help for suicidal tendencies that arose from mistreatment by staff and prison conditions. Saylor said that Powers had been incarcerated at Wallens Ridge since March 8, 2018, when he was received from MCTC.  Saylor said that Powers was housed in the D-3 housing unit where he was receiving mental health treatment in the SDTP, which was designed for offenders who have been classified as Severely Mentally Ill, ("SMI"). Saylor said the SDTP operated with structured security regulations and procedures, while providing programming and treatment services conducive with evidence-based treatment protocols and individualized

15

treatment plans. An offender with the SMI designation, Saylor said, had been diagnosed with a psychotic disorder, bipolar disorder, major depressive disorder, post-traumatic stress disorder, anxiety disorder or any diagnosed mental disorder associated with serious impairment in psychological, cognitive or behavior functioning that substantially interfered with the offender's ability to meet the ordinary demands of living. Saylor said that Powers was diagnosed with bipolar II disorder and borderline/anti-social personality disorder and had a history of cutting himself.

Saylor said, to address Powers's mental health treatment needs, he was assigned a treatment team consisting of his treatment counselor, a psychology associate and a psychiatrist. When Powers was placed in SDTP in April 2018, Saylor said, a treatment plan was developed for him to address depression, impulsive behaviors and anxiety. Saylor said that Powers was provided intervention plans to address each of these symptoms, including coping skills, participation in programming (anger management and thinking for a change), identifying triggers and having positive interaction with his peers on a weekly basis. Saylor said that the psychiatrist saw Powers every 90 days, and Powers met monthly with his treatment team in an office environment to discuss his treatment and any concerns.

According to Saylor, records indicated that Powers had a number of incidents of self-mutilation at Wallens Ridge. Saylor said these incidents usually occurred when Powers felt that he was being slighted. On November 10, 2019, Powers was disruptive in the housing unit by kicking the cell door and covering his window, Saylor said. When the lieutenant instructed Powers to pack his property to be removed from the pod, Powers began cutting himself in the neck and chest area with

16

what appeared to be a piece of razor blade.  Saylor said that Powers's wounds required stitches and glue to close them. Powers was placed on mental health safety precautions in the Medical Department until November 13, 2019.  Saylor said that security staff again observed Powers making cuts on his neck, arms and chest on November 18, 2019.  Powers reported that his meal tray was messed up, and no one wanted to fix anything for him; he stated that he attempted to get people to do things the right way, but no one wanted to do that.  Powers said that "if you all send me back over there, I am going to keep cutting myself open." Powers was placed on mental health safety precautions with 15-minute watches in the Medical Department, metal restrictions and a safety diet.  Powers was removed from precautions and placed on mental health observation on November 22, 2019.

On November 25, 2019, Powers refused to return to his assigned housing unit, and he said that he would engage in self-harm if he was moved out of the Medical Department. On November 29, 2019, Powers reported that he was feeling good in the Medical Department, and he asked to speak with the administration about his family not being able to send him money. Staff talked with Powers at length on December 5, 2019, about returning to the SDTP, and Powers gave staff a list of things he wanted from the administration before he would be willing to return to the SDTP pod; this list included unblocking his money, a list of requirements to be completed for him to get out of the unit and for supervisors to address issues with staff.  With resolution of his prison account issue, Powers was released from mental health observation on December 19, 2019, and he agreed to return to the SDTP.

Saylor said that Powers was seen by the psychiatrist on December 30, 2019, and was doing well and following his treatment plan. Saylor said that, to the best of

17

Saylor's knowledge, Powers's mental health needs were being addressed and treated at Wallens Ridge.

The defendants also provided an affidavit from J. Ely, the Unit Manager of the D Building at Wallens Ridge. (Docket Item No. 32-3.) Ely said that he was aware that Powers had alleged that he had threatened him and instructed officers to serve him small meal portions and to refuse him showers and outside recreation. Ely said that Powers was received at Wallens Ridge from MCTC on March 8, 2018, and assigned to the SDTP in the D-3 Pod, where he received specialized mental health care.

Ely said that, contrary to Powers's allegations, he had not encouraged staff to serve him small meal portions or trays with meat on them. Housing staff, including Ely, were not responsible for preparing offender meal trays, he said. Ely said that Powers received a Common Fare vegetarian tray, which was prepared by kitchen staff and approved by Food Service managers before the tray left the kitchen. Ely said that meal trays were brought to the D-3 Pod on a cart and were distributed to each offender's cell.  Ely said that Powers received a Common Fare vegetarian meal, which was marked as such. Ely said that, when the officer fed Powers, a random Common Fare vegetarian tray was removed from the cart, the lid was removed, and it was placed on Powers's food box for Powers to accept. He said that Powers's name was not on the tray.

Ely said that he and Lovell, the Regional VDOC SDTP representative, met with Powers on January 30, 2020. He said that Powers requested special handling of his meal trays, in which his trays would be held up to the housing unit camera before

18

he received it. He said that Powers also requested that a correctional officer measure the portions on his tray before he received it. Ely said that he explained to Powers that his requests could not be met because the officers were not trained to measure food portions, and the pod cameras could not capture exact measurements of the food on his tray. Ely said that he had no reason to believe that Powers was not receiving adequate food portions and vegetarian Common Fare meals. Ely said he had not told staff to serve Powers trays containing meat.

Ely said that he made rounds in the housing units with treatment counselors and building lieutenants and sergeants each morning between 7 and 7:30 a.m. During these rounds, Ely said, they see each offender in the housing unit. Ely said that Powers also met monthly with his assigned Psychological Associate and Counselor to discuss his concerns. Ely said that he had not directed staff to threaten Powers or to encourage him to harm himself.

Ely said that offenders in the D-3 housing unit were provided showers every 72 hours and outside recreation daily for two hours each day. He said that Powers usually participated in outside recreation.  Ely said that two classes are offered daily in the pod on Monday through Friday, with each class lasting for two hours. During these classes, offenders sit at tables in the pod area. Ely said that a Psychology Associate provided the D-3 offenders an opportunity to come into the pod area to listen to music once a week when the offenders could pick songs and listen to them as a group. He said that Powers also had access to the kiosk in the pod.  He said that offenders housed in the D-3 Pod had the opportunity to spend six to seven hours each day out of their cells. Two correctional officers were assigned to the pod, according to Ely.

While Powers has alleged that he has been mistreated, abused and violently assaulted since April 2018, based on Ely's interactions with Powers and the information available to Ely, Ely said, Powers was receiving an adequate and appropriate diet, outside recreation, in-pod recreation, showers and necessary mental health care and treatment.  Ely said that Powers had not been mistreated, abused or assaulted at Wallens Ridge.

On April 6, 2020, Powers notified the court that defendants Ely, Collins and Manis had been transferred to other positions and no longer had any authority over the SDTP at Wallens Ridge. (Docket Item No. 42.)  Powers also filed an affidavit, (Docket Item No. 42-1) ("Affidavit"), in which he stated that Major King told him, on or around March 20, 2020, that he would not move Powers to a re-entry housing unit designed for prisoners who would soon be released from custody. Instead, he said, King told him that he would try to transfer Powers to general population where King would have more control over him.  Powers said that King told him he would not transfer him to the re-entry housing unit because all the lawsuits he had filed had "pissed off a lot of the staff he is friends with." Powers also stated that King told him that he wanted to place Powers where he could "test" him. He stated that King told him he would not live to see his release day and that other offenders still were eating from feeding tubes and on ventilators years after "failing their tests." Powers said that he asked King what these prisoners had done to deserve to be treated that way. He said that King responded, "nothing," staff "just didn't like them." Powers said that King asked him to write a letter explaining what he would do if released from the SDTP program. Powers said he wrote this letter and gave it to Lt. Kimberlin. King is not a defendant in this case.

In his Affidavit, Powers said that he earned the maintenance phase in the SDTP program on March 30, 2020, along with the incentives of extra phone calls, a higher commissary spending limit and being allowed to walk to showers, kiosk, recreation cages and meetings and classes without restraints. Powers stated that Lt. Kimberlin, Lt. Bryant, Unit Manager Carico, Counselor Rose, QMHP Wright and all segregation staff agreed that he was supposed to be able to move freely in his housing unit without restraints. Nevertheless, Powers said, Officer Sluss, on April 1, 2020, required him to be restrained to be escorted to the showers. Powers said that, when he asked Sluss why he was requiring Powers to be restrained, Sluss responded "because you get upset sometimes." He said that Sluss also told him that he was not going to allow Powers to go to the showers unrestrained because Powers had filed a civil rights claim against him.  Powers said he told Sluss he had rights, including the right to file lawsuits in federal court. He said that Sluss responded that he did not have any rights because he was a prisoner. He said that Sluss told him, if he kept complaining, Sluss would not let him out of his cell for anything, and he would file charges against him. Powers said that he requested to speak to a supervisor and a QMHP, and, in response, Sluss made a comment about him "crying."

Powers also stated that the emergency buttons in all of the serious mental illness pod had not worked since January 2019.  He said that the prison administration refused to repair the buttons, so prisoners would kick their doors or cover their cell door windows to get the attention of and be able to speak to a supervisor.  Powers said that he had done neither of these acts since trying to kill himself on November 10, 2019. Powers said that he covered his cell door window on April 1, 2020, for about five minutes to get the attention of staff to request a mental health worker, Lt. Bryant and Counselor Rose come see him about Sluss's

21

behavior. Powers said that Sluss told him that he was charging him for covering his cell door window.  Powers said that he questioned why Sluss was charging him when other prisoners did this daily and were not charged. He said that Sluss responded that he should have never filed a civil suit against him and that a petty charge was all he needed to do to prevent Powers from being allowed to move about the pod unrestrained.  Powers said that Sluss told him that, if Powers dropped his claim against him, Sluss would stop "messing" with him. Sluss said that, if Powers did not drop his claims against Sluss, Sluss would continue pushing Powers until Powers cut himself again, which would result in either Powers's suicide or being forced to start the program all over again.  Powers said that Sluss told him that, if Powers was transferred out of the program, he was going to come to where he was and pick a fight with Powers to make him pay for suing him. Powers said that Sluss told him that Sluss was good friends with Major King and could get away with anything he did to Powers.

Powers said that Sluss would allow other prisoners out of their cells unrestrained, despite the fact that these prisoners continually threatened staff and made demands for staff to perform acts or they would "throw fits and threaten to harm themselves." Powers said that Sluss allowed another prisoner to "terrorize" the pod by causing disturbances and threatening other prisoners.  He said that Sluss still allowed this prisoner to come out of his cell unrestrained and have a special assignment job after being charge free for only 29 days. Powers said that Sluss helped another prisoner get an in-pod unrestrained job after being out of segregation for only three weeks and with a history of spitting and throwing fluids on others, throwing trays and urinating on an officer through the tray slot.  Powers said that when he asked Sluss why these prisoners were allowed out of their cells unrestrained

22

when he was not, Sluss told him to worry about himself. He said that Sluss told him that, if he continued to complain, it would get worse, and he would continue retaliating until Powers dropped his lawsuit.

By proposed order tendered to the court, (Docket Item No. 42-2), Powers seeks preliminary injunctive relief ordering defendants Sluss, Clark, Parsons, Warden Manis, Warden Zook, QMHP Richard Saylor, Ely, Carico, Collins, Major King and Lovell to have no contact with Powers and to stop denying Powers the privileges and incentives he has earned in the SDTP, to stop denying Powers's graduation from the SDTP, to stop harassing Powers with unnecessary disciplinary charges that hinder his progression through the program and to stop threatening Powers's physical safety. Parsons no longer is a defendant in this case. Zook, Carico and King also are not defendants in this case.

In response to Powers's requests for preliminary injunctive relief, the defendants also have provided affidavits from A. Lovell, (Docket Item No. 47-1) ("Lovell Affidavit"), and R. Mathena, (Docket Item No. 47-2) ("Mathena Affidavit"). The Lovell Affidavit states that Lovell is the VDOC Statewide Serious Mental Illness Coordinator. Lovell stated that, as of April 25, 2020, Powers had completed all phases of Wallens Ridge's High Security Diversionary Treatment Program, ("HSDTP"). Lovell said that Powers would stay at the highest level of the HSDTP, Phase 4, until transfer to River North's SDTP. Lovell stated that Powers's transfer would be scheduled when the current VDOC transfer suspension was lifted. Lovell stated that other offenders who had graduated from the HSDTP or transitioned to another SDTP site also were awaiting transfer until the transfer suspension was lifted.

23

The Mathena Affidavit states that R. Mathena is the Director of Security and Correctional Enforcement for the VDOC and oversees the VDOC Serious Mental Illness, ("SMI"), and Restrictive Housing programs. Mathena stated that all VDOC transfers and movement between facilities have been suspended until further notice due to the COVID-19 pandemic. He said that the only prisoner transfers taking place were for emergency medical reasons. Mathena said that Powers had been approved to step down from Wallens Ridge's HSDTP to the SDTP at River North. He said that Powers would be transferred to River North when the COVID-19 transfer suspension was lifted by the VDOC. Mathena stated that he could not project when this might occur.

Powers's motion for transfer is neither sworn nor filed under penalty of perjury. (Docket Item No 48.) In this motion, Powers alleges that he has been told that he has been approved for transfer to River North, but the VDOC is not transporting any prisoners for any reason other than emergency medical treatment due to the COVID-19 pandemic. Powers seeks an order for his immediate transfer to River North. Powers attached an Institutional Classification Authority Hearing report to this motion. This report shows that Powers has been approved for transfer to River North.

The defendants have responded that all transfers and movement of offenders between VDOC facilities is suspended until further notice due to the COVID-19 pandemic. The defendants agreed that Powers had been approved to step down from Wallens Ridge's HSDTP to the SDTP at River North, but he would not be transferred until the VDOC transfer suspension was lifted.

24

## II.    *Analysis*

"The law is well settled that federal injunctive relief is an extreme remedy." *Simmons v. Poe*, 47 F.3d 1370, 1382 (4th Cir. 1995). Furthermore, a preliminary injunction is considered "an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied 'only in [the] limited circumstances' which clearly demand it." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991) (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3rd Cir. 1989)). The party seeking entry bears the burden to establish that these factors support granting a preliminary injunction: (1) the movant's likelihood of succeeding on the merits of the action; (2) the likelihood of irreparable harm to the movant if preliminary injunctive relief is denied; (3) that the balance of equities tips in the movant's favor; and (4) that an injunction is in the public interest. *See Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

As stated above, the Motions before the court seek the entry of preliminary injunctive relief ordering that the defendants transfer Powers to either MCTC or River North, stop denying Powers the privileges and incentives he has earned in the HSDTP, stop denying Powers's graduation from the HSDTP, stop harassing Powers with unnecessary disciplinary charges that hinder his progression through the HSDTP and stop threatening Powers's physical safety. The Motions also seek preliminary injunctive relief prohibiting defendants Manis, Collins, Saylor, Ely, Sluss, Clark and Lovell from having any contact with Powers. Based on the evidence currently before the court, I find that Powers has failed to establish that the entry of

any preliminary injunctive relief is appropriate, and I recommend that the court deny the Motions.

Insofar as the Motions seek entry of any preliminary injunctive relief against defendants Manis, Collins or Ely, Powers has provided information to the court that these defendants have been transferred to positions that have no authority over the Wallens Ridge HSDTP. Therefore, I will recommend that any request for preliminary injunctive relief against these defendants be denied as moot. I also will recommend that the court deny as moot Powers's request for preliminary injunctive relief ordering that the defendants refrain from hindering his progression through or graduation from the HSDTP and provide him with the incentives and privileges he has earned in the HSDTP. The evidence before the court shows that Powers has completed the HSDTP at Wallens Ridge and has been approved for transfer to the SDTP at River North. Lovell, the VDOC Statewide Serious Mental Illness Coordinator, has provided evidence that Powers has completed all phases of Wallens Ridge's HSDTP and would stay at the highest level of the HSDTP, Phase 4, until transfer to River North's SDTP. Mathena also provided evidence that Powers has been approved to step down from Wallens Ridge's HSDTP to the SDTP at River North. Further, Powers, himself, has provided an Institutional Classification Authority Hearing report showing that he has been approved for transfer to the SDTP at River North.

I further will recommend that the court deny Powers's remaining requests for preliminary injunctive relief because he has failed to show the likelihood of succeeding on the merits of his claims, the likelihood of irreparable harm to him if the preliminary injunctive relief is denied, that the balance of equities tips in his

26

favor and that the preliminary injunctive relief requested is in the public interest. In his Complaint, Powers alleged that his Eighth Amendment right to be free from cruel and unusual punishment was violated beginning in January 2018 and continuing by the denial of recreation, showers, phone and kiosk use, meals and classes designed to assist in recovery from mental illness, constant illumination of his cell, destruction of personal property, threats of physical harm, harassment and name-calling by staff and constant noise caused by other prisoners kicking, banging, screaming and taunting each other.

The Eighth Amendment to the U.S. Constitution not only prohibits excessive sentences, but it also protects inmates from inhumane treatment and conditions while imprisoned. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). This includes a requirement that a state provide medical care, including necessary psychiatric care, to those it punishes by incarceration. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *Godfrey v. Russell*, 2015 WL 5657037, at *8 (W.D. Va. Sept. 24, 2015) (citing *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977) ("We see no … distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart")); *Chapman v. Rhodes*, 434 F. Supp. 1007, 1020 (S.D. Ohio 1977), *aff'd*, 624 F.2d 1099 (6th Cir. 1980), *rev'd on other grounds*, 452 U.S. 337, 344 (1981). For a prisoner to prevail on a constitutional claim for denial of medical care, he must demonstrate that a defendant's acts or omissions amounted to deliberate indifference to his serious medical needs. *See Estelle*, 429 U.S. at 106. In essence, treatment rendered must be so grossly incompetent or inadequate as to shock the conscience or to be intolerable to fundamental fairness. *See Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted). To prevail on a claim of a violation of the Eighth Amendment based on conditions of

27

confinement, a prisoner "must show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." *In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 471 (4th Cir. 1999) (quoting *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993)) (internal quotation marks omitted).

With regard to a prisoner's medical treatment, a prison official is deliberately indifferent if he knows of, but disregards, an inmate's serious medical need. *See Farmer v. Brennan*, 511 U.S. 825, 844-45 (1994). Liability under this standard requires two showings. First, the evidence must show that the prison official subjectively recognized a serious medical need. It is not sufficient that the official should have recognized it; the official must actually have known of it. *See Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). A medical need serious enough to give rise to a constitutional claim involves a condition that places the inmate at a substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment perpetuates severe pain. *See Farmer*, 511 U.S. at 832-35; *Sosebee v. Murphy*, 797 F.2d 179, 182-83 (4th Cir. 1986); *Loe v. Armistead*, 582 F.2d 1291, 1296-97 (4th Cir. 1978); *Rush v. Vandevander*, 2008 WL 495651, at *1 (W.D. Va. Feb. 21, 2008). Second, the evidence must show that the prison official subjectively recognized that his actions were "inappropriate in light of that risk." *Rich*, 129 F.3d at 340 n.2. It is insufficient that the official should have recognized that his actions were insufficient. *See Brown v. Harris*, 240 F.3d 383, 390-91 (4th Cir. 2001).

The same is true regarding a claim of deliberate indifference to the dangers posed by a condition of confinement. To amount to deliberate indifference, a public

28

official must have been personally aware of facts indicating a substantial risk of serious harm, and the official must have actually recognized the existence of such a risk. *See Farmer*, 511 U.S. at 837. "[D]eliberate indifference entails something more than mere negligence, … [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835.

Turning to the facts of Powers's claims, the court is persuaded that Powers suffers from a serious medical need – a psychiatric condition which appears to at least contribute to his prior attempts at self-harm. Nonetheless, the court is not persuaded that Powers is likely to succeed on claims that his treatment and/or conditions of confinement at the hands of the defendants amounted to deliberate indifference, in that he has not persuaded the court that his mental health treatment or his conditions of confinement posed any objective substantial risk of serious harm or that any of the defendants subjectively knew that they posed any such risk.

In particular, the evidence currently before the court shows that Powers's mental health needs were being addressed and treated at Wallens Ridge. In particular, Psychology Associate Senior Saylor has provided evidence that, while at Wallens Ridge, Powers has been assigned a treatment team consisting of a treatment counselor, a psychology associate and a psychiatrist, and a treatment plan was developed for Powers to address his depression, impulsive behaviors and anxiety. Saylor said that Powers also was provided intervention plans to address each of these symptoms, including coping skills, participation in programming (anger management and thinking for a change), identifying triggers and having positive interaction with his peers on a weekly basis. Saylor said that the psychiatrist saw

29

Powers every 90 days, and Powers met monthly with his treatment team in an office environment to discuss his treatment and any concerns. According to Saylor, Powers was seen by the psychiatrist on December 30, 2019, and was doing well and following his treatment plan. While Powers has engaged in incidents of self-mutilation while housed at Wallens Ridge, Saylor has provided evidence that Powers received medical treatment for his wounds and was placed on mental health precautions until he no longer posed a danger to himself. Saylor also provided evidence that Powers had been placed on mental health precautions on the occasions that he threatened self-harm.

The evidence before the court also does not show that Powers faced any serious risk of injury from his conditions of confinement. In particular, Wallens Ridge Food Service Operations Director Stallard said, that to the best of her knowledge, Powers's dietary needs were being adequately met on the alternate Common Fare diet, and he was not being served trays with flesh or meat. Many of Powers's other complaints regarding his conditions of confinement – lack of showers, lack of recreation, harassment and taunting – Powers alleged were due to Ely's instructions to the officers who worked the HSDTP pod. Powers, however, has provided evidence that Ely no longer has any authority over the HSDTP at Wallens Ridge. Furthermore, Powers's allegations that Treatment Officer Sluss has verbally harassed him, has failed to provide him with all the privileges and incentives he has earned through the HSDTP and has not treated all inmates in the pod equally do not pose a substantial risk of serious harm.

Insofar as Powers requests this court enter injunctive relief ordering his immediate transfer from Wallens Ridge to River North, I find that this injunctive

30

relief is not in the public interest at this time. By Standing Orders entered March 16 and 24 and April 16, 2020, (Standing Order No. 2020-5, Amended Standing Order No. 2020-5 and Second Amended Standing Order 2020-5), this court has recognized that both the President of the United States and the Governor of the Commonwealth of Virginia have declared states of emergency in response to the COVID-19 pandemic and the public health emergency caused by the pandemic. Mathena has provided evidence that due to the Governor's declaration of a state of emergency due to the COVID-19 pandemic, and the fact that VDOC facilities as recent as April 29, 2020, were still seeing active cases of COVID-19, all VDOC transfers and movement between facilities, other than for emergency medical treatment, have been suspended until further notice. Based on the evidence currently before the court, I cannot find that it is in the public interest to second-guess the VDOC's current restrictions and order Powers's transfer at this time.

Based on the above-stated reasons, I recommend that the court deny Powers's Motions.

## PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.   Powers's request for preliminary injunctive relief against defendants Manis, Collins and Ely, and his request for preliminary injunctive relief ordering that the defendants refrain from hindering his progression through or graduation from the HSDTP and provide him with the incentives and privileges he has earned in the HSDTP, are moot;

31

2.      Powers has not shown he has a likelihood of succeeding on the merits
        of his claims;

3.      Powers has not shown that he faces the likelihood of irreparable harm
        if preliminary injunctive relief is denied;

4.      Powers has not shown that the balance of equities tips in Powers's
        favor; and

5.      Powers has not shown that the preliminary injunctive relief requested
        is in the public interest.


## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court deny Powers's

Motions seeking preliminary injunctive relief.


## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.

§636(b)(1)(C):


Within fourteen days after being served with a copy [of this Report and
Recommendation], any party may serve and file written objections to
such proposed findings and recommendations as provided by rules of
court. A judge of the court shall make a de novo determination of those
portions of the report or specified proposed findings or
recommendations to which objection is made. A judge of the court may
accept, reject, or modify, in whole or in part, the findings or
recommendations made by the magistrate judge. The judge may also
receive further evidence or recommit the matter to the magistrate judge
with instructions.


Failure to file written objection to these proposed findings and

recommendations within 14 days could waive appellate review. At the conclusion

of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record and unrepresented parties.

DATED: May 26, 2020.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE